Local 346, Int'l Brotherhood of Police Officers v. Labor Relations Commission.

LOCAL 346, INTERNATIONAL BROTHERHOOD OF POLICE
OFFICERS vs. LABOR RELATIONS COMMISSION
& another.[1]

Suffolk.  November 9, 1983. — March 14, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Police. Public Employment,* Police. *Municipal Corporations,* Police, Collective bargaining. *Labor,* Collective bargaining, Polygraph test.

General Laws c. 150E did not require a town to negotiate with a police union over the town police department's decision to require certain police officers to submit to polygraph examinations in the investigation of alleged criminal activity by police officers, in view of the town's overriding interest in the integrity of its police.  [435-442]

APPEAL from a decision of the Labor Relations Commission. The Supreme Judicial Court ordered direct appellate review on its own initiative.

*Cynthia S. Denton* for the plaintiff.
*Jean Strauten Driscoll* for the defendant.
*Robert W. Gardner, Jr.,* for the intervener.

ABRAMS, J.  In *Baker* v. *Lawrence,* 379 Mass. 322 (1979), we held that G. L. c. 149, § 19B,[2] permits a police department to require police officers suspected of criminal activity to submit to polygraph testing under threat of discipline.  We now

---

[1] Town of Ayer, intervener.

[2] General Laws c. 149, § 19B, as amended through St. 1973, c. 620, provides as follows: "Any employer who subjects any person employed by him, or any person applying for employment, including any person applying for employment as a police officer, to a lie detector test, or requests, directly or indirectly, any such employee or applicant to take a lie detector test, shall be punished by a fine of not more than two hundred dollars. This section shall not apply to lie detector tests administered by law enforcement agencies as may be otherwise permitted in criminal investigations."

hold that G. L. c. 150E does not require a city or town to negotiate with the union over the police department's decision to use polygraph examinations in the investigation of criminal activity by police officers. Therefore, we affirm the decision of the Labor Relations Commission (commission), dismissing a complaint of prohibited practice filed against the town of Ayer.

The facts, as found by the commission, are not disputed and can be briefly summarized. For approximately eight months during 1979, a construction company in Ayer hired off-duty police officers to guard a manufacturing site.[3] In February, 1980, after the company had terminated its employment of police officers, the manufacturing site was broken into and extensively ransacked. Damage estimates ranged from $25,000 to $45,000. The Ayer police department began an extensive investigation of the crime but for some time was unable to identify any suspects.

In April, 1981, in the course of casual conversation with a fellow officer, an Ayer police officer stated that he and three fellow officers, identified by name, had perpetrated the vandalism as retaliation for the company's termination of their employment as private guards.[4] Eventually, this information was relayed to the Attorney General, who began his own investigation of the incident in July, 1981.

By the late summer of 1981, the possible involvement of the four police officers in the crime, as well as the Attorney General's decision to investigate, had become public knowledge, and spawned public distrust of the police department.[5] One of the suspected officers resigned. The Ayer chief of police, who was related to that officer, separated himself from the department's

---

[3] The officers were compensated at a rate of one and one-half times their regular pay. Almost all of the fifteen police officers employed by the town rendered private protection services to the company during 1979.

[4] The officer who confessed his participation in the crime later denied all involvement and testified that he had made the admission jokingly after the officer with whom he was speaking himself confessed participation in another criminal offense.

[5] There was evidence that townspeople would call the police department only when specific police officers were on duty, and that, although it was common practice for Ayer residents to notify the police when leaving a house unattended, they were reluctant to do so after this investigation became public.

investigation and, subsequently, also resigned his position. In February, 1982, the Ayer selectmen appointed a new police chief. The new police chief decided to terminate the police department's official investigation of the vandalism so as not to interfere with the Attorney General's investigation, but, acting on a belief that the matter hampered the effectiveness of the police department,[6] pursued an internal investigation.

In early April, 1982, the police chief ordered the three officers under suspicion to take polygraph examinations. The chief scheduled the examination of one of the three officers for April 14, 1982. The chief informed the officer that the results would not be used against him in a criminal proceeding, but that, if the officer failed to take the examination, the chief would recommend discipline, including dismissal. The chief denied the officer's request for a postponement of the examination pending the officer's consultation with a lawyer.

Prior to the scheduled examination date, the officer called another of the suspects, who was the president of the union local, and informed him of the chief's ultimatum. The three suspected officers then met with union attorneys, who advised them to request a postponement of the polygraph examination in order to permit further legal consultation. The officers spoke to the police chief, who refused the request.

On April 14, 1982, the officer whose polygraph examination was scheduled for that date refused to travel to Boston, where the test was to be administered. The police chief immediately suspended the officer for five days and wrote a letter to the Ayer selectmen recommending dismissal. The letter stated that, unless the officer were dismissed, the police chief's ability to investigate the vandalism incident would be eliminated. On the

---

[6] In addition to creating public distrust, the incident factionalized the department, exacerbating a preexisting schism between the group of officers accused of the vandalism and a second group thought to have transmitted the incriminating information to the Attorney General. Members of the second group voluntarily submitted to polygraph examinations. The record does not reveal the nature of the questioning of those officers, but, according to the commission's findings, the officers "passed" the examinations.

same date, the chief scheduled polygraph examinations of the other two officers for April 20 and April 21.

On April 16, the selectmen held a hearing regarding the suspended officer. Immediately prior to the beginning of the hearing, counsel for the union delivered a letter to the selectmen demanding that the town agree to meet and bargain in good faith with respect to the use of polygraph tests to examine police employees.[7] The letter also requested that the suspended officer be returned to active duty status pending the outcome of such negotiations. The selectmen denied the request to bargain. The selectmen considered the request untimely, and the subject matter nonnegotiable.[8] The selectmen voted an indefinite suspension of the officer.

On April 20, the second officer was taken in a police cruiser to Boston for the scheduled polygraph examination. The examiner asked the officer to sign a waiver releasing the examiner and his company from any claims which might arise from the examination and permitting the examiner to inform the police chief of the examination results. The officer agreed to the dissemination of the results but refused to sign the release of the examiner and his company. The officer asked the examiner to administer the test; the examiner refused to do so unless the officer signed the release. When it became evident that an impasse had been reached, the examiner told the officer to leave. On the next day, a similar scenario took place with respect to the third officer's examination.

Upon learning what had transpired, the police chief suspended the two officers for five days. The chief asked the selectmen to dismiss the two officers for failing to obey his order to take the polygraph examinations. The chief also emphasized the officers' failure to testify before the grand jury

[7] The selectmen represent the town for purposes of collective bargaining with the plaintiff union. See G. L. c. 150E, § 1.

[8] The commission rejected the town's argument that the union waived by inaction its right to bargain, finding that the demand, made one week after the initial polygraph examination was ordered, was not untimely. That issue is not presented on this appeal.

investigating the crime.[9] On April 23, 1982, the selectmen held hearings concerning the second and third officers and voted to dismiss them for their refusal to obey the chief's orders to take polygraph examinations, as well as for their noncooperation with the grand jury. The selectmen subsequently voted to dismiss the first officer (who had been indefinitely suspended) for his refusal to obey the chief's order to take the polygraph test.[10]

On April 20, 1982, the union filed a charge with the commission alleging that the town engaged in a prohibited practice under G. L. c. 150E, § 10 (a) (1) and (5), by unilaterally implementing the requirement that the officers submit to polygraph examinations and by refusing the union's request to bargain over that decision. After the commission issued a complaint of prohibited practice, a formal hearing was held before a hearing officer. On October 26, 1982, the commission dismissed the complaint in a decision which we discuss below. The union appealed the commission's decision to the Appeals Court pursuant to G. L. c. 150E, § 11. We transferred the case here on our own motion.

---

[9] The officers had received subpoenas directing them to appear before the grand jury on April 1, 1982. Prior to that date, the officers' attorney entered into an agreement with an assistant attorney general providing that, because the officers intended to exercise their privilege against self-incrimination, they would not be called before the grand jury. On April 1, the officers were asked by the assistant attorney general to waive the agreement; the officers refused to do so and reiterated their intent to invoke the Fifth Amendment privilege if called to testify. The officers were not called before the grand jury.

[10] As we read the record, two of the officers, who were otherwise prepared to submit to polygraph testing, insisted on retaining their rights to bring potential claims against the test administrator, and, because of that insistence, the polygraph examiner refused to administer the examination. The issue whether the selectmen appropriately characterized these events as refusals by the police officers to submit to polygraph testing was not before the commission and is not argued or briefed on appeal. We thus have no occasion to consider whether the two officers' conduct constituted insubordination or provided just cause for their dismissals. See *Wolfberg* v. *Hunter,* 385 Mass. 390, 391 n.1 (1982); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975) (issues not briefed or argued are deemed waived). For the same reason, we do not address the effect of the selectmen's partial reliance on the officers' exercise of their constitutional privilege against self-incrimination in connection with the grand jury proceeding on the validity of the dismissals voted by the selectmen.

In its decision, the commission initially determined that the polygraph examinations at issue were permitted under G. L. c. 149, § 19B, as amended through St. 1973, c. 620.[11] That statute prohibits employers from requiring employees to submit to lie detector tests but excepts "lie detector tests administered by law enforcement agencies as may be otherwise permitted in criminal investigations." Turning to the separate question whether G. L. c. 150E, § 6, required the town to negotiate with the union before implementing the polygraph requirement, the commission applied a balancing test articulated in a prior decision, *Boston School Comm.,* 3 M.L.C. 1603 (1977). In measuring, for purposes of the balancing test, the importance of the town's interest in requiring that officers suspected of criminal activity submit to polygraph examination, the commission referred to this court's conclusion in *Baker* v. *Lawrence,* 379 Mass. 322 (1979), that the statutory exception "recognize[s] an evident interest of the employer in applying some pressure to assist an investigation leading to exoneration of the employee or the opposite." *Id.* at 327. The commission did not specify the extent of the impact upon the employment relationship of the polygraph requirement but implicitly found that the officers' interest in negotiating over that requirement, however strong, was outweighed by the town's interest in utilizing polygraph tests in such circumstances.

The commission also found support for its conclusion that G. L. c. 150E does not require a police department to negotiate over an order that police officers suspected of criminal activity undergo polygraph testing in a line of cases decided by the New York Public Employee Relations Board. Those cases require a police department to negotiate over the use of polygraphs during investigations "solely relating to ordinary employee departmental discipline," *Police Benevolent Ass'n of White Plains, Inc.,* 12 N.Y. P.E.R.B. par. 3046 (1979); see *Buffalo Police Benevolent*

---

[11] The union does not dispute this conclusion. In *Baker* v. *Lawrence,* 379 Mass. 322, 329-330 (1979), we held that the term "criminal investigations" in the excepting language of G. L. c. 149, § 19B, permits a police department to require polygraph examinations during investigations with "an obvious departmental aspect" if there is "an alleged crime in the picture" rather than a violation of a department regulation.

*Ass'n,* 9 N.Y. P.E.R.B. par. 7020 (N.Y. S.Ct. 1976), but hold that the issue of a police department's use of polygraphs while investigating "suspected and actual crimes of policemen" is outside the scope of terms and conditions of employment, and that a police department is not, therefore, required to bargain over such testing. *Police Benevolent Ass'n of White Plains, Inc., supra.* See *Salamanca Police Unit,* 12 N.Y. P.E.R.B. par. 4503 (H.O. 1979).

1. The union contends that the commission relied on G. L. c. 149, § 19B, "as the decisive factor" in its determination that the town did not violate G. L. c. 150E by refusing to bargain with the union over the institution of polygraph exams. The union takes the position that the commission's authority extends only to applications and interpretations of G. L. c. 150E, that the commission is precluded from analyzing external legislation in ruling on a charge of prohibited practice brought under the public employer collective bargaining law, and that the commission exceeded its authority in adjudicating the case. In the alternative, the union posits that the commission committed an error of law in interpreting G. L. c. 149, § 19B, as precluding a finding that the town had a duty to negotiate under G. L. c. 150E.

We believe that the union misreads the rationale of the commission's decision. Although the town, in its answer to the complaint of prohibited practice, raised the affirmative defense that its use of polygraphs is governed by G. L. c. 149, § 19B, and therefore not subject to bargaining under G. L. c. 150, § 6, the commission appears to have disregarded that defense. It is apparent that the commission based its decision on a determination that the management concerns of police departments in thorough investigation of employees reasonably suspected of engaging in criminal activity outweigh the interests of the union representing those employees in negotiating about the administration of such tests. The commission's reference to this court's interpretation of G. L. c. 149, § 19B, in *Baker* v. *Lawrence, supra,* hardly constitutes an interpretation by the commission of that statute. We thus have no occasion to examine the extent of the commission's authority to interpret

statutes other than G. L. c. 150E in adjudicating prohibited practice claims. But see *Worcester Police Officials Ass'n,* 4 M.L.C. 1366, 1368 (1977) (commission reluctant to interpret statutes other than G. L. c. 150E ''unless compelled to do so . . . when a claim under some other statute is raised as an affirmative defense to a charge of prohibited practice'').

As we read the commission's decision, it relied on G. L. c. 149, § 19B, only to the extent necessary to establish that the police department's order in this case was not prohibited by law (a conclusion the union does not dispute, see note 11, *supra),* and to corroborate its determination that the town has a weighty interest in requiring such examinations. We therefore reject the union's argument that the commission exceeded its authority or erred in its consideration of G. L. c. 149, § 19B.

2. The union attacks as arbitrary and an abuse of discretion the commission's ruling that the polygraph requirement falls outside the arena of ''terms and conditions of employment'' and is not subject to mandatory bargaining. In essence, the union challenges the balancing test applied by the commission in deciding whether G. L. c. 150E, § 6, compels the town to negotiate over the use of the polygraph. The union alleges that the commission unjustifiably and arbitrarily deviated from precedent establishing that a rule on which continued employment is contingent is a ''condition of employment.'' We conclude that the commission properly took into account the unique requirements of a police employer in distinguishing the cases relied on by the union and correctly determined that the town was not required to negotiate with the union before ordering polygraph examinations.

The union argues that because the officers were required to comply with the polygraph order or face discharge, the town's decision to institute polygraph tests had a direct, rather than ''peripheral,'' impact on the officers' employment, and that G. L. c. 150E, § 6, therefore compels negotiation. See *Boston School Comm.,* 3 M.L.C. 1603, 1607 (1977); *Medicenter, Mid-South Hosp.,* 221 N.L.R.B. 670 (1975). The commission concedes that ''the threat of loss of employment is at the very heart of the work relationship.'' The question raised by this case

is whether G. L. c. 150E, § 6, imposes a per se requirement that every matter directly affecting the employment relationship be the subject of mandatory bargaining.

In *School Comm. of Newton* v. *Labor Relations Comm'n,* 388 Mass. 557 (1983), we noted that the subject of layoffs "involved the very essence of the [employer-employee] relationship, the employment itself, and not a peripheral matter," *id.* at 563, and was therefore presumptively a "term[ ] and condition[ ] of employment" subject to the bargaining requirements of G. L. c. 150E, § 6, *id.* However, we also implicitly acknowledged that some decisions directly affecting employment conditions may be exempt from the bargaining requirements of G. L. c. 150E, § 6. Responding to the school committee's argument that the general authority over the operation and maintenance of public schools conferred upon it by G. L. c. 71, §§ 37 and 68, took precedence over the duty to bargain over layoffs established by G. L. c. 150E, § 6, we stated that G. L. c. 150E, § 6, evidenced a "legislative purpose to subject that general authority to the collective bargaining process, *absent some overriding policy against interfering with the school committee's right to determine significant aspects of educational policy*" (emphasis added). *Id.* at 566. Finding no "overriding policy" against compelling the school committee to negotiate over the subject of janitorial layoffs, we determined that mandatory bargaining was required by G. L. c. 150E, § 6. Thus, we left open the possibility that in instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions, G. L. c. 150E, § 6, does not mandate bargaining over a decision directly affecting the employment relationship.

The commission's decisions also hold that management decisions directly affecting the work relationship require negotiation, see *Town of Danvers,* 3 M.L.C. 1559, 1571 (1977); *Commonwealth of Massachusetts,* 5 M.L.C. 1800 (H.O. 1979), unless the employer has an overriding interest which outweighs the negotiation process. See *City of Boston,* 5 M.L.C. 1723, 1726 (1979) ("[O]nly if [a proposal's] impact on terms and conditions of employment outweighs its im-

pingement on core managerial prerogatives or concerns will the proposal be deemed mandatorily bargainable"). Cf. *Boston School Comm.*, 3 M.L.C. 1603, 1607 (1977). There is no error in the commission's conclusion that the police department's overriding interest in the integrity of its police officers exempted the town from negotiating with the union over the use of polygraph examinations to investigate criminal activity by police officers.

The balancing test applied by the commission in this case is consistent with the standard enunciated by the United States Supreme Court in construing the bargaining requirements imposed by the parallel provisions of the National Labor Relations Act. In *First Nat'l Maintenance Corp.* v. *NLRB*, 452 U.S. 666, 679 (1981), the Supreme Court observed that "in view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process outweighs the burden placed on the conduct of the business." See *Fibreboard Paper Prods. Corp.* v. *NLRB*, 379 U.S. 203, 223 (1964) (Stewart, J., concurring). Acknowledging that, as a general rule, mandatory bargaining over questions of vital concern to labor and management "will result in decisions that are better for both management and labor and for society as a whole," *First Nat'l Maintenance Corp.* v. *NLRB*, *supra* at 678, the Supreme Court observed that "[m]anagement must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business," *id.* at 678-679. See *Newspaper Guild of Greater Philadelphia, Local 10* v. *NLRB*, 636 F.2d 550, 562 (D.C. Cir. 1980) (in establishing existence of duty to bargain over matters basic to both management and employees, "a balance must be struck . . . which will take account of the relative importance of the proposed actions of the two parties").

The list of factors so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements will of necessity vary with the nature of the employer. The effective operation of certain private sector employers

has been found to be linked sufficiently to the integrity of employees to justify the unilateral imposition of rules designed to preserve that integrity. In *Newspaper Guild of Greater Philadelphia, Local 10* v. *NLRB, supra,* the United States Court of Appeals for the District of Columbia Circuit upheld the right of a newspaper to impose, without submitting to collective bargaining, regulations designed to preclude reporters from engaging in activities detrimental to the newspaper's aura of objectivity. Reasoning that "protection of the editorial integrity of a newspaper lies at the core of publishing control," and that "credibility is central to their ultimate product and to the conduct of the enterprise," *id.* at 560, the court held that regulations reasonably necessary to the protection of the newspaper's integrity were not subject to mandatory bargaining under § 8 (d) of the National Labor Relations Act, 29 U.S.C. § 158 (d) (1976), even though employees violating these regulations were subject to discharge. *Newspaper Guild of Greater Philadelphia, Local 10* v. *NLRB, supra* at 565.

Few institutions depend as heavily on integrity and credibility for the effective performance of their duties as do police departments.[12] We have little hesitation in concluding that, when

---

[12] The union argues that the commission inadequately distinguished *Medicenter, Mid-South Hosp.,* 221 N.L.R.B. 670 (1975), in which the NLRB held a private employer's use of polygraph tests to investigate employees suspected of vandalism a mandatory subject of bargaining. *Medicenter* is distinguishable as involving a private employer, rather than a police department charged with preserving public order and preventing crime. See generally *School Comm. of Boston* v. *Boston Teachers Local 66,* 378 Mass. 65, 70 (1979) ("It is by now well recognized that the subjects of public sector collective bargaining are more restricted than those in private sector labor relations"); *Newspaper Guild of Greater Philadelphia, Local 10* v. *NLRB,* 636 F.2d 550, 560 n.34 (D.C. Cir. 1980) (whether credibility and integrity are fundamental to enterprise may depend on "special characteristics" of enterprise). We conclude, therefore, that the commission did not err in electing not to follow *Medicenter.*

We note that because the excepting language of G. L. c. 149, § 19B, applies only to lie detector tests administered by law enforcement agencies, other employers are prohibited from initiating such testing whether or not they negotiate with the employees affected. Thus, in the factual situation discussed in *Medicenter,* employees in Massachusetts would be absolutely protected from polygraph testing.

the functions of a police department are disrupted by allegations of criminal conduct by police officers, the police department's decision to subject officers reasonably suspected of criminal activities to lie detector tests furthers law enforcement objectives that override the employees' interest in negotiation.[13] To require collective bargaining over a police department's use of available techniques for investigating substantial allegations of criminal activities by officers "would be totally subversive of the discipline and efficiency which is indispensable to a public law enforcement agency." *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 502 (1970). See *Dolan* v. *Kelly,* 76 Misc. 2d 151, 157 (N.Y. Sup. Ct. 1973) ("the effective operation of [a police] department requires that suspected misconduct of members of the force be thoroughly investigated"). We therefore conclude that the Legislature did not intend G. L. c. 150E, § 6, to render the decision to institute such tests contingent on the collective bargaining process.[14]

Further, G. L. c. 149, § 19B, specifically treats the use of lie detectors in the employment context. The Legislature, "although generally averse to [lie detector] tests forced by employers upon their employees," *Baker* v. *Lawrence, supra* at 327, elected not to place any restrictions on a police department's testing of its own employees in the course of criminal investiga-

---

[13] The union asserts that, because the reliability of lie detector tests is disputed, see *Commonwealth* v. *Vitello,* 376 Mass. 426, 431 (1978); *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 429 (1974), and because other means of internal investigation are available, the decision to use polygraphs to investigate alleged crimes by police officers cannot be said to further an overriding governmental interest. We have previously noted that, notwithstanding limitations on the evidential use of polygraph results, polygraph testing furthers "the legitimate needs of certain criminal investigations." *Baker* v. *Lawrence,* 379 Mass. 322, 329 n.11 (1979). See *Dolan* v. *Kelly,* 76 Misc. 2d 151, 157 (N.Y. Sup. Ct. 1973). Moreover, G. L. c. 149, § 19B, is indicative of "a legislative judgment that the polygraph may be useful as an investigatory aid." *Baker* v. *Lawrence, supra* at 328 n.9.

[14] The obligation to bargain under G. L. c. 150E, § 6, inserted by St. 1973, c. 1078, § 2, "shall not compel either party to agree to a proposal or make a concession." Procedures for resolving an impasse between the union and the public employer may be lengthy and inconclusive. See G. L. c. 150E, § 9, as amended through St. 1979, c. 594, § 1. That result would be unacceptable in matters concerning the integrity of police officers.

tions. The link between effective law enforcement and a police department's ability to subject its employees suspected of criminal activities to lie detector tests is acknowledged by this statutory exemption.

The union argues that the Legislature, in preserving the right of law enforcement agencies engaged in criminal investigations to administer lie detector tests to employees ''as may be otherwise permitted,'' meant the availability of that right to be determined through collective bargaining. We find no support in the history of § 19B[15] for this interpretation. In *Baker* v. *Lawrence, supra,* we interpreted the excepting language of § 19B as permitting an employer to request that an employee submit to a lie detector test administered by a law enforcement agency, ''with implied job sanctions if the employee finally declines.'' *Id.* at 327. We rejected as intent-defeating a construction of the phrase ''as may be otherwise permitted'' that would require the acquiescence of the employee as a precon-

---

[15] As originally inserted by St. 1959, c. 255, G. L. c. 149, § 19B, imposed a blanket prohibition on an employer's use of lie detector tests. In 1963, the statute was amended to permit ''lie detector tests administered by law enforcement agencies in the performance of their official duties.'' St. 1963, c. 797. In 1973, two bills restricting a law enforcement agency's ability to subject policemen to lie detector examinations were considered by the General Court. The Legislature rejected 1973 Senate Doc. No. 673, which would have eliminated such testing completely by deleting the excepting language and reinstating the blanket prohibition. The Legislature adopted language in 1973 House Doc. No. 7114, prohibiting polygraph testing of persons applying for employment as police officers, but omitted language explicitly including police officers already employed within the scope of the prohibiting language. See *Baker v. Lawrence, supra* at 326-327 & n.7. The excepting sentence was also amended to sanction ''lie detector tests administered by law enforcement agencies *as may be otherwise permitted in criminal investigations*'' rather than ''lie detector tests administered by law enforcement agencies *in the performance of their official duties*'' (emphasis added). G. L. c. 149, § 19B, as amended by St. 1973, c. 620.

The union seeks to invoke the collective bargaining process in a context where the subject affects not only the employer-employee relationship, but, in a direct sense, the safety of the public. There is no indication that the Legislature intended the 1973 amendment to subject a law enforcement agency's use of lie detectors to collective bargaining. Absent a showing that the Legislature intended such an application of G. L. c. 150E, we are not disposed to construe that statute or G. L. c. 149, § 19B, as placing such an obstacle in the path of efficient law enforcement.

dition to such testing. *Id.* at 328. It would likewise be anomalous to construe § 19B's excepting language as requiring the acquiescence of the employee's union.

We conclude that the commission did not err in determining that the town's decision to order polygraph testing was within the town's exclusive managerial prerogative.[16]

*Decision of the Labor Relations*
*Commission affirmed.*

---

[16] We have said that even if a decision is one committed to a public employer's prerogative, G. L. c. 150E, § 6, may impose a duty to bargain over the means and impact of the decision. *Burlington* v. *Labor Relations Comm'n,* 390 Mass. 157, 165 (1983). *School Comm. of Newton* v. *Labor Relations Comm'n,* 388 Mass. 557, 564 (1983). In the instant case, however, the union has not briefed or argued that there is a distinction between the "decision" to require officers suspected of criminal activity to submit to polygraph testing or to face discharge, and the "means" or impact of that decision. We perceive none. In any event, the issue is waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).