NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-14                                      Appeals Court

TOWN OF DRACUT  vs.  DRACUT FIREFIGHTERS UNION, IAFF LOCAL 2586.

No. 19-P-14.

Middlesex.     November 7, 2019. - May 1, 2020.

Present:  Agnes, Sullivan, & Blake, JJ.


Arbitration, Collective bargaining, Authority of arbitrator,
     Fire fighters, Judicial review.  Contract, Collective
     bargaining contract, Arbitration.  Labor, Arbitration,
     Collective bargaining, Fire fighters.  Municipal
     Corporations, Collective bargaining, Fire department.
     Public Employment, Collective bargaining.  Fire Fighter.



     Civil action commenced in the Superior Court Department on
February 6, 2017.

     The was heard by Joshua I. Wall, J., on a motion for
judgment on the pleadings.


     Joseph G. Donnellan for the defendant.
     Stanley L. Weinberg for the plaintiff.


     SULLIVAN, J.  The Dracut Firefighter's Union, IAFF Local

2586 (union), appeals from a judgment entered in the Superior

Court vacating an arbitration award in favor of the town of

Dracut (town).  The award arose from a grievance filed after the

chief of the Dracut Fire Department (fire department) implemented a new policy preventing on-duty firefighters assigned to the east and west fire stations from attending union meetings at the central fire station.  The arbitrator found that the chief's decision to impose a ban on travel by on-duty firefighters to union meetings at the central fire station from the east and west stations violated the parties' collective bargaining agreement (CBA).  The Superior Court judge vacated the arbitration award on the ground that it exceeded the arbitrator's authority by infringing on the nondelegable authority of the chief.  See G. L. c. 48, § 42; G. L. c. 150C, § 11 (a) (3).  We reverse.

Background.  We summarize the facts found by the arbitrator, which are binding on a reviewing court.  See Pittsfield v. Local 447 Int'l Bhd. of Police Officers, 480 Mass. 634, 637-638 (2018); School Comm. of Lexington v. Zagaeski, 469 Mass. 104, 105 n.3 (2014).[1]

The fire department is staffed twenty-four hours per day, seven days a week.  The union holds meetings on a monthly basis.  By necessity, these meetings are scheduled during a shift.  Prior to 1986, union meetings were held off-site, at bars or

---

[1] The arbitrator summarized the witnesses' testimony in these matters, and credited all of it.  Where, as here, there are no facts in dispute, we understand these to be the arbitrator's findings.

restaurants.  In 1986, the parties agreed that, in order to ensure attendance at union meetings by members and union officers assigned to work the shift when the meeting took place, the union would be permitted to hold its meetings at the central station, where the fire department's headquarters is located.  This agreement was memorialized in the parties' CBA, Article 20, § 2, which stated that "any meeting either special or regular monthly meeting of [the union] will be allowed to be held at the central station (Sta. 1).  Scheduled (unless waived) at least three days in advance with the Chief."

When the parties agreed to this language in 1986, the fire department had two stations:  the central station and the west station.  In 2000, the fire department opened a third station, the east station.  Article 20, § 2, remained in the parties' successor CBAs, apparently unchanged, from 1986 through the 2015-2018 CBA.

From the time the parties agreed to Article 20, § 2, in 1986, until April 6, 2016, the practice of permitting firefighters at the outlying stations (i.e., the west station and the east station) to attend union meetings at central station was consistent.  Depending on the shift, each outlying station had a single crew of two or three firefighters on duty. Before leaving for the central station, these crews would call the central station and report to the officer in charge that

they were ready to leave for the union meeting. The officer in charge would then inform them if they needed to stay at their assigned station due to "inclement weather or other public safety considerations." If no such circumstances existed, each crew drove the full complement of equipment to which it was assigned to the central station for the duration of the meeting. If any calls for service came in during the union meeting, crews deployed from the central station. The same procedure was used by crews at the outlying stations when they left their stations to go to the central station for other activities, such as inspections, memorial services, public relations activities, training, drills, and for refueling. The chief's ban applied only to union meetings, not the other activities.

On April 6, 2016, the chief informed the union that he would no longer permit on-duty firefighters from the outlying stations to attend union meetings at the central station. He told the union's executive board that he was concerned about potential delays in response times if crews departed from the central station rather than from the outlying stations. Specifically, he stated he was concerned about meeting the fire department's goal of reducing response times to six minutes or less, a goal which the fire department was meeting only 45.8% of

the time.[2]  The chief further suggested that the fire department could work with the union to use videoconferencing technology to permit firefighters from the outlying stations to participate in meetings remotely.[3]  The chief did not apply this new rule to inspections, memorial services, public relations activities, training, drills, refueling, or like activities at the central station.

The union filed a grievance alleging that the chief's new policy violated Article 20, § 2, and the parties' past practice. The union prevailed at arbitration and the town filed a complaint in Superior Court to vacate the arbitration award.  A judge of the Superior Court concluded that the award intruded upon the nondelegable authority of the chief to manage the fire

---

[2] The chief cited a report prepared by an outside consultant on fire department response times between January, 2015 and October, 2015.  During that period, the average response time was 6.15 minutes, and 54.2% of responses came in over six minutes.  The report did not disaggregate response times from individual stations or note whether any delay had been caused by the circumstances at issue here, that is, where crews from outlying stations responded from the central station.

[3] The record does not contain the Local 2586's constitution or by-laws, which would govern whether personal attendance at union meetings was required at the time this case arose.  We recognize that since this case was argued, a global pandemic has altered the manner in which many segments of society do business.  Whether union meetings may be conducted by video conference is a matter of internal union governance, however, a matter over which the town has no direct authority. See G. L. c. 150E, § 10 (a) (2) (prohibiting employer domination, interference, or assistance "in the formation, existence or administration of any employee organization").

department, particularly with respect to matters of public safety.  This appeal followed.

Discussion.  This case calls upon us to balance numerous competing policies.  The fire department performs an important public safety function, and response time is a matter of public safety.  By the same token, the Legislature has declared a public policy in favor of self-organization and collective bargaining.  We conclude, under the unique facts of this case, that the public safety interest expressed by this particular policy is not so heavy as to warrant vacating the award on either nondelegability or public safety grounds.

Because the public policy of the Commonwealth strongly encourages both collective bargaining and arbitration, see G. L. c. 150E, § 6; School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753, 758 (2003), a court may "vacate arbitration awards only in rare, statutorily enumerated circumstances."  Pittsfield, 480 Mass. at 637.  See G. L. c. 150C, § 11.  Among those circumstances are those in which "[a]n arbitrator . . . intrudes upon decisions . . . left by statute to the exclusive managerial control of designated public officials."  Boston v. Boston Police Patrolmen's Ass'n, 477 Mass. 434, 440 (2017), quoting Massachusetts Bd. of Higher Educ./Holyoke Community College v. Massachusetts Teachers

Ass'n/Mass. Community College Council/Nat'l Educ. Ass'n, 79

Mass. App. Ct. 27, 32 (2011).[4]

The judge concluded that the arbitration award was not

entitled to deference because it ran afoul of G. L. c. 48, § 42,

which sets forth a fire chief's authority over the fire

department.  The judge determined that the arbitrator exceeded

his authority by usurping the chief's nondelegable authority to

manage the workforce, and make decisions pertinent to matters of

public safety.[5]  He concluded that this dispute was one which the

_____

[4] We review the decision of the Superior Court judge de novo.  Pittsfield, 480 Mass. at 637.

[5] In the course of his decision, the judge stated that the arbitrator had "order[ed] the [t]own periodically to close two of its fire substations so that firefighters stationed there [could] attend union meetings."  The arbitrator took care to find that the CBA did not contain a per se rule, and that under the parties' binding past practice, the chief retained the authority to order firefighters to remain at the east or west station in the event that public safety so required.  Where, as here, the parties have elected to resolve disputes through a binding grievance and arbitration procedure, a reviewing court may not engage in fact finding, and must be "considerably more deferential [to an arbitrator's award] than even the abuse of discretion or clear error standards applied to lower court decisions."  Pittsfield, 480 Mass. at 638.  A reviewing court does not review for actual or perceived errors of fact or law; the arbitrator's findings and rulings are binding in the absence of narrowly enumerated instances of fraud, corruption, certain procedural irregularities, an award that exceeds the arbitrator's powers, or a violation of a well-defined and articulated public policy.  See id. at 638-639; Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 818 (2005); School Dist. of Beverly v. Geller, 50 Mass. App. Ct. 290, 293 (2000).

parties could not lawfully agree to collectively bargain or arbitrate.

1.  Nondelegability.  The nondelegability doctrine has evolved over time, and it is helpful to revisit its derivation and its current application in order to determine its proper contours in the case before us.  Statutes such as G. L. c. 41, § 97A, and G. L. c. 48, § 42, defining the authority of police and fire chiefs, respectively, were adopted long before collective bargaining became a reality for all cities and towns in 1974.[6]  With the enactment of G. L. c. 150E, collective bargaining imposed new obligations on public sector employers, and public policy questions born of the tensions between G. L. c. 150E and other statutes defining the authority of public officials ensued.[7]  This tension was particularly acute in the context of public safety, most notably policing.  See Massachusetts Coalition of Police, Local 165, AFL-CIO v. Northborough, 416 Mass. 252, 255 (1993).

---

[6] See St. 1920, c. 591, § 27 (town fire chiefs); St. 1948, cc. 540, 595 (town police chiefs); St. 1973, c. 1078, § 7, effective July 1, 1974 (public sector collective bargaining).

[7] We have focused on police and fire department statutes in this opinion, but the doctrine has been considered in a number of contexts.  See generally Board of Higher Education v. Commonwealth Labor Relations Bd., 483 Mass. 310 (2019) (citing cases).

The Supreme Judicial Court addressed one aspect of these tensions by adopting the nondelegability doctrine.

> "Pursuant to G. L. c. 150E, § 6, public employers must 'negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment.'  However, from that expansively defined category of mandatory bargaining subjects, we have exempted certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion.  '[I]n instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions, G. L. c. 150E, § 6, does not mandate bargaining over a decision directly affecting the employment relationship.'  Local 346, Int'l Bhd. of Police Officers v. Labor Relations Comm'n, 391 Mass. 429, 437 (1984).  See Boston v. Boston Police Patrolmen's Ass'n, 403 Mass. 680, 684 (1989); Burlington v. Labor Relations Comm'n, 390 Mass. 157, 164 (1983); Lynn v. Labor Relations Comm'n, 43 Mass. App. Ct. 172, 178-179 (1997).  '[T]he inquiry has been directed towards defining the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process.  Id. at 178.  '[T]he crucial factor in determining whether a given issue is a mandatory subject of bargaining is whether resolution of the issue at the bargaining table is deemed to conflict with perceived requirements of public policy.'  Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public Sector Labor Relations Law, 72 Mass. L. Rev. 102, 103 (1987)."

Worcester v. Labor Relations Comm'n, 438 Mass. 177, 180-181 (2002).  In sum, the nondelegability doctrine is a judicially created doctrine limiting the reach of G. L. c. 150E, §§ 6-7, in those circumstances where public policy requires that a public employer reserve certain personnel matters to its sole

discretion in order to preserve accountability to the public in the performance of the essential functions of government.

The application of the nondelegability doctrine has most recently been addressed in Board of Higher Educ. v. Commonwealth Employment Relations Bd., 483 Mass. 310 (2019), in which the Supreme Judicial Court explained and synthesized the development of the nondelegability doctrine over the last several decades.[8] That case teaches that we must balance two competing interests. These interests are the "principle of nondelegability[, which extends] only so far as is necessary to preserve the [pubic employer's] discretion to carry out its statutory mandates" (citation omitted), id. at 319, and the public policy favoring collective bargaining.  See G. L. c. 150E, § 6.

"The scope of a governmental employer's nondelegable authority depends on 'the explicitness of the statutory authorization under which [that] employer acts.'"  Board of Higher Educ., quoting Lynn, 43 Mass. App. Ct. at 182.  "Where . . . the employer acts 'under the authority of a statute or law authorizing the employer to perform a specific, narrow function or, alternatively, acts with reference to a statute specific in

---

[8] The motion judge did not have the benefit of Board of Higher Educ., 483 Mass. 310, at the time he rendered his decision.

purpose that would be undermined if the employer's freedom of action were compromised by the collective bargaining process,' we will not enforce a conflicting provision in a collective bargaining agreement." Id. at 320, quoting Lynn, supra at 180.[9] In contrast, broad "'general grants of authority . . .' must yield to the obligation to engage in collective bargaining" where the ingredient of public policy is not so weighty. Id. at 319, quoting School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 565-566 (1983).

Like the statute in Board of Higher Educ., 483 Mass. at 320-321, G. L. c. 48, § 42, gives the fire chief authority over his or her fire department in "broad [and] general" terms. The fire chief "shall have charge of extinguishing fires in the town and the protection of life and property in case of fire," has the power to purchase and repair property and apparatus used by the fire department subject to the approval of the select board, shall have the powers and duties of an engineer, the authority to appoint deputy chiefs, officers, and firefighters, and "may remove the same at any time for cause and after a hearing." G. L. c. 48, § 42. In addition the chief has "full and

---

[9] One such statute is G. L. c. 32, § 16 (1) (a), which grants fire chiefs the narrow and specific nondelegable statutory authority to seek involuntary retirement of members of the fire department for superannuation, disability, or accidental disability. See Lynn, 43 Mass. App. Ct. at 184.

absolute authority in the administration of the department, shall make all rules and regulations for its operation, [and] . . . shall fix the compensation of the permanent and call members of the fire department subject to the approval of the selectmen."  Id.

Where, as here, there is a broad grant of authority, "the scope of exclusive management powers has been worked out 'on a case by case basis.'"  Board of Higher Educ., 483 Mass. at 319, quoting Lynn, 43 Mass. App. Ct. at 177.  "The list of factors so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements will of necessity vary with the nature of the employer."  Worcester, 438 Mass. at 181, quoting Local 346, Int'l Bd. of Police Officers, 391 Mass. at 438.  "[W]e ask 'whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect.'"  Board of Higher Educ., supra, quoting Lynn, supra at 178.  See Burlington v. Labor Relations Comm'n, 390 Mass. 157, 164 (1983).

In conducting a case by case analysis, we have been particularly sensitive to issues of public safety.  See notes 10-14, infra.  A policy that impacted response times in a fire department could raise an important public safety issue.  But as presented in this case, the town has not demonstrated the

existence of a public policy of sufficient weight, or a core managerial function of sufficient gravity, to warrant denying effect to collective bargaining.  The town permits on-duty firefighters to leave the east and west fire stations to attend events at the central fire stations for a variety of events sanctioned by the chief.  The chief's policy is directed solely to attendance at union meetings.[10]  A policy this selective is not "fundamental to the effective operation of an enterprise." Worcester, 438 Mass. at 181, quoting Local 346, Int'l Bhd. of Police Officers, 391 Mass. at 438.  Nor does a policy this idiosyncratic contain the ingredient of public policy so heavy as to warrant overriding the right to self-organization guaranteed under G. L. c. 150E, as discussed infra.

The town maintains, however, that the public safety function of the fire department is simply too critical to allow anything other than unfettered decision-making by the fire chief regarding the deployment of personnel.  The town relies on a number of cases involving the nondelegable authority of police chiefs.  Leaving to one side whether the contours of the

---

[10] The union asked the arbitrator to decide not only whether the chief's decision violated Article 20, § 2, of the CBA, but to also find that the new policy discriminated on the basis of union activity in violation of a separate provision of the CBA. Having found that the policy violated Article 20 of the CBA, the arbitrator did not reach the second issue.

nondelegability doctrine apply in the same manner to fire departments as police departments,[11] this is not a case about the fire chief's authority to assign[12] or transfer[13] personnel, to require mandatory overtime,[14] or to make other decisions deemed

---

[11] See Worcester, 438 Mass. at 180-181; Chief of Police of Dracut v. Dracut, 357 Mass. 492, 502 (1970) ("What we have said above may not necessarily apply to agreements covering employees of other municipal departments").

[12] See Worcester, 438 Mass. at 183 (city not obligated to bargain over assignment of police officers to enforce truancy laws); Boston v. Boston Police Patrolmen's Ass'n, 403 Mass. at 684 (noting police commissioner's nondelegable authority to assign one officer rather than two to marked patrol vehicle); Burlington, 390 Mass. at 164 (exclusive managerial prerogative to assign prosecutorial duties); Chief of Police of Dracut, 357 Mass. at 500-502 (police chief's statutory authority to assign officers); Framingham v. Framingham Police Officers Union, 93 Mass. App. Ct. 537, 542-544 (2018) (transfer and reassignment of police officers within exclusive managerial authority of police chief); Boston v. Boston Police Superior Officers Fed'n, 52 Mass. App. Ct. 296, 300-301 (2001) (police commissioner not required to bargain over temporary assignments to Boston police department communications center); Taunton v. Taunton Branch of the Mass. Police Ass'n, 10 Mass. App. Ct. 237, 243 (1980) (police chief's statutory authority to assign officers to particular duties as matter of public safety); Boston v. Boston Police Superior Officers Fed'n, 9 Mass. App. Ct. 898, 899 (1980) (police commissioner's nondelegable authority to make temporary assignment).

[13] See Boston v. Boston Police Superior Officers Fed'n, 466 Mass. 210, 214-215 (2013) (police commissioner's nondelegable authority to transfer officers between precincts); Framingham, 93 Mass. App. Ct. at 542-544.

[14] See Saugus v. Saugus Pub. Safety Dispatchers Union, 65 Mass. App. Ct. 901, 901-902 (2005) (police chief's exclusive managerial prerogative to assign overtime shifts); Andover v. Andover Police Patrolmen's Union, 45 Mass. App. Ct. 167, 169-170 (1998) (police chief's authority to assign mandatory overtime);

essential to the effective operation of a public safety department.[15] This is a case about whether union officers and members may attend union meetings, and is therefore more akin to Local 2071, Int'l Ass'n of Firefighters v. Bellingham, 67 Mass App. Ct. 502 (2006), S.C., 450 Mass. 1011 (2007) ("judgment must be affirmed, for the same reasons articulated by the Appeals Court"). There the town moved to vacate an interest arbitration award ordering the adoption of twenty-four hour shifts. The town had argued that public safety would be threatened by twenty-four hour shifts, because responding firefighters could be sleep deprived. After reviewing the public safety arguments,

_____

Boston v. Boston Police Patrolmen's Ass'n, 41 Mass. App. Ct. 269, 272 (1996) (police commissioner's exclusive "zone of managerial authority" to assign mandatory overtime).

   [15] See Massachusetts Coalition of Police, Local 165, AFL-CIO, 416 Mass. at 257 (reappointment of police officer is nondelegable managerial prerogative); Broderick v. Police Comm'r of Boston, 368 Mass. 33, 41 (1975), cert. denied, 423 U.S. 1048 (1976) (police commissioner has authority to question officers regarding some aspects of private conduct); Boston Police Patrolmen's Ass'n v. Boston, 367 Mass. 368, 371-372 (1975) (police commissioner has nondelegable authority to require officers seeking elective office to take leave of absence without pay during campaign); Selectmen of Ayer v. Sullivan, 29 Mass. App. Ct. 931, 932 (1990) (reappointment of police officer nondelegable); Boston v. Boston Police Superior Officers Fed'n, 29 Mass. App. Ct. 907, 908 (1990) (staffing levels, assignments, uniforms, weapons, and definition of duties are nondelegable); Boston v. Boston Police Patrolmen's Ass'n, 8 Mass. App. Ct. 220, 226-227 (1979) (police commissioner could not bargain away authority to control weapons).

this court confirmed the interest arbitration award, holding that shift hours were a "core" subject of collective bargaining,[16] and that "[t]o reserve to the sole discretion of management a core subject of collective bargaining . . . on public safety policy grounds requires a clearer showing that public safety is being affected by the . . . proposal." Id. at 512.[17]  Similarly, the ability of union officers and members to attend union meetings is at the core of the right to self-representation.  See G. L. c. 150E, §§ 2, 10 (a) (1)-(2).[18]  And like Local 2071, Int'l Ass'n of Firefighters, a clearer showing of a threat to public safety than the one made here is required to impinge upon such a statutorily protected right.  Were we to

_____

[16] See Boston v. Boston Police Patrolmen's Ass'n, 477 Mass. at 440-442 (police commissioner's agreement to arbitrate discipline by negotiating "just cause" provision does not intrude on commissioner's nondelegable authority).

[17] Although not at issue here, we note that the "means of implementing managerial decisions . . . may be the subject of an enforceable provision in a collective bargaining agreement" even if the underlying decision is reserved to management.  Boston v. Boston Police Superior Officers Fed'n, 29 Mass. App. Ct. at 908, citing  School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 563-564 & n.5 (1983).  See generally Board of Higher Educ., 483 Mass. at 321-322.

[18] The Department of Labor Relations has concluded that "the subject of on-duty officers' attendance at union meetings is clearly [a] mandatory" subject of bargaining, where stations are staffed on a twenty-four hour, seven days a week basis.  Taunton v. Taunton Branch, Mass. Police Ass'n, 7 M.L.C. 2133, 2136 (1981).

accept, on the record presented, that G. L. c. 48, § 42, imbues the chief with nondelegable authority to preclude on-duty firefighters working in fire stations staffed around the clock, seven days a week, from attending union meetings, "we would be hard-pressed to discern any limiting principle" to the chief's nondelegable authority. Board of Higher Educ., 483 Mass. at 321.

2. Public safety. The town also contends that even if collective bargaining over attendance at union meetings might be permitted, the award violates an important public policy because public safety would be endangered by a delay in response times. This argument is overbroad. As the court noted in Local 2071, Int'l Ass'n of Firefighters, 67 Mass. App. Ct. at 513-514, there must be a clear showing that public safety will be affected. That showing was not made in this arbitration. The new policy does not prohibit on duty firefighters at the east and west stations from attending inspections, memorial services, public relations activities, training, drills, refueling, or like activities at the central fire station. The recitation of facts in the arbitrator's decision contained no basis for concluding that there was a correlation between response times and

attending events at the central fire station.[19] See id.
Additionally, under the arbitrator's award, the chief retains
his or her historical "discretion to decide based on
circumstances, on a given day, that firefighters should not
leave an outlying station to attend a [u]nion meeting." This
discretion, which the arbitrator found had previously been
exercised to keep all three stations fully staffed in instances
of "inclement weather or other public safety considerations,"
remains available to the chief or the officer in charge.

Conclusion. The fire department policy barring on-duty
union members and officers from attending union meetings at the
central fire station is not shielded from arbitrable review by
the nondelegability doctrine. The arbitrator found that the new
policy conflicted with the terms of the CBA. Resolution of
conflicts between a CBA and "the regulations of a fire chief or
other head of a fire department pursuant to chapter forty-eight"
is governed by G. L. c. 150E, § 7 (d). Where, as here, a
dispute involves mandatory subjects of bargaining under G. L.
c. 150E, § 6, "the terms of the collective bargaining agreement
shall prevail." G. L. c. 150E, § 7 (d). For the reasons

---

[19] The arbitrator's decision stated: "[The fire chief]
stated that when he compiled his reports on response times he
did not break it down by response times for each station, nor
did he know the times when a crew from [the east or west
station] was at Central Station when a call for service came
from one of the outlying stations."

provided, we reverse the judgment of the Superior Court.  A new judgment shall enter confirming the arbitrator's award.

<u>So ordered</u>.