HERBERT BAKER & others[1] *vs.* CITY OF LAWRENCE & another.[2]

Essex. October 2, 1979. — December 6, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Police. Public Employment. Constitutional Law,* Self-incrimination.

The administrative head of a city police department, conducting an investigation into a theft from a store alleged to have been committed by police officers in connection with their duties respecting a breaking and entering at the store, was entitled, after giving Miranda warnings, to request the officers to submit to a polygraph test to be administered by State police, and to imply that job sanctions would be imposed if the officers finally declined to take the test; such action by the administrative head was excluded by the second section of § 19B of G. L. c. 149, as amended through St. 1973, c. 620, from the prohibition in the first section thereof against employers subjecting employees to lie detector tests [326-327]; the investigation was a "criminal" one under the second section of § 19B, as well as having a departmental aspect [327-330].

The disclosure that may constitutionally be requested of public employees extends to disclosure through the medium of a polygraph test [330-332]; the Massachusetts and Federal restrictions and protections on disclosure are a strong shield against infringement of rights of public employees under the Fifth Amendment to the United States Constitution [332-333].

CIVIL ACTION commenced in the Superior Court Department on October 2, 1978.

[1] John Cavarretta, Anthony Lorenzo, John Lundy, Jr., Clayton Soucie, Albert Viti, and Lawrence Patrolman's Association.

[2] Terrance D. Schiavone.

The case was heard by *Garrity*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Anthony R. DiFruscia (Kathleen M. Sullivan & Kenneth M. Homsey* with him) for the plaintiffs.

*Edward J. Grimley, Jr.*, City Solicitor, for the defendants.

*Frank J. McGee & William B. Vernon* for the Boston Police Patrolmen's Association, Inc., amicus curiae, submitted a brief.

*William M. Shipps*, Commissioner of Labor and Industries, amicus curiae, submitted a brief.

KAPLAN, J. We took for direct review the appeal of the plaintiffs, six police officers of the city of Lawrence,[3] from a declaratory judgment of the Superior Court regarding the legality and consequences of a request by the defendant director of public safety of the city that they submit to a lie detector test.

The facts, summarized in the findings which form the basis of the judgment, are drawn largely from the parties' stipulation, and are not in material dispute. About 1 A.M., September 19, 1978, Sergeant Leo Ouellette and the plaintiff officers responded to an apparent breaking and entering of Mickey's sporting goods store on Essex Street, Lawrence. A man crouched in a nearby entryway was quickly apprehended as a suspect, but he was without any loot. Examining the store, the police found no evidence of theft; cash in the cash register appeared undisturbed. Shortly, Hyman Kimell, the store owner, arrived and joined in the search which failed to indicate a loss.

Later that morning, however, after the departure of the police, Kimell discovered that certain knives, a bag containing checks, and more than $1,000 in cash were missing from the store. Thereupon he called the defendant Terrance D.

---

[3] Lawrence Patrolman's Association, of which the six officers were members, was named as a plaintiff and as an appellant, but its standing in either capacity is dubious. The question is not significant as the police officers concerned are themselves plaintiffs and appellants.

Schiavone, an alderman and director of public safety of the city (thus administrative head of the Lawrence police department), reported the loss, and said that as the items had not been found nearby or in the suspect's possession, they must have been taken by one or more of the police. Kimell said neither he nor any of his employees was responsible for the abstraction, in proof of which all were willing to submit to polygraph examination.

Schiavone, feeling that Kimell's allegations put the department under a "cloud of suspicion," promptly phoned Sergeant Joseph St. Germain and instructed him to question the officers and Sergeant Ouellette[4] about their activities regarding the break-in; to inform them of the willingness of Kimell and his employees to undergo the polygraph test; and to ask the officers whether they would likewise submit voluntarily to such a test.

On September 20, the plaintiff officers and Ouellette were each called in turn to an interrogation room at the station house before Sergeants St. Germain, Francis Landers, and (barring his own case) Ouellette, and questioned by them, a record being made on tape. Before the questioning began, each officer was read Miranda warnings, signed a card attesting to the fact, and was informed that any statement he made could and would be used against him in any criminal proceeding.[5] The questions canvassed what each officer had done or observed at the investigation of the break-in the previous morning. The parties agree that the officers gave full answers.

St. Germain, following Schiavone's orders, told each officer about Kimell and his employees' volunteering to take the polygraph test, and asked the officer whether he was willing to take a similar test. There is some uncertainty how the officers responded at this session and uncertainty, also, wheth-

---

[4] But Sergeant Ouellette was to be present at the interrogation of the others.

[5] We are not called upon to intimate any opinion whether the statements could lawfully be so used.

er any of the sergeants made any threats about disciplinary action if an officer should refuse a test. However, these matters need not be pursued, for by their commencement of the present action on October 2 the officers may be taken to have refused the polygraph test, unless, perhaps, they would be faced with job sanctions if they refused — a real possibility, as the defendant Schiavone has stated on the record that "[i]f an officer refuses to voluntarily submit to the polygraph examination which will be limited to said officer's official duties that night, I intend to consider disciplinary action against said officer." As to possible use of the polygraph results if an officer took the test, the alderman stated that "[w]hile the results of said test would not be used in a criminal prosecution the said results could be used in a disciplinary hearing."

On October 3 a judge of the Superior Court granted temporary relief restraining the defendants from taking disciplinary action against the plaintiffs, but the order did not forbid the second round of interrogation of the individual officers that took place on October 4-5. Now conducting the questioning (preceded as before by the Miranda formulas) were two State police officers invited by Schiavone to assist in the investigation. Also present were Schiavone, members of the Lawrence police department, and the attorney for the Lawrence Patrolman's Association, apparently acting in effect as counsel for the officers. The questioning related again to the break-in investigation including questions whether the officer had taken the missing property or had information about who might have taken it. In response to an inquiry by the attorney, Schiavone said the investigation was "departmental and criminal."

The plaintiff officers contended in the action that the request to them to submit to a polygraph test, with the threat of disciplinary action if they refused, offended against G. L. c. 149, § 19B, and was otherwise prohibited. A declaration was prayed with accompanying injunctive relief. The judgment appealed from, dated December 22, 1978, declared, in the circumstances above described, that the cited statute

did not preclude the request by the administrative head of department that the officers submit to a test to be administered by the State police, and that an officer, by refusing to comply, could properly be subjected to job sanctions. The injunctive relief, claimed by the plaintiffs upon a contrary view of the law, was denied. Appeal having been lodged in the Appeals Court, we brought the case here on the plaintiffs' application. Meanwhile, under an order of a single justice of the Appeals Court, the plaintiffs in fact severally took a polygraph test, but any material use of the results was to abide further order.[6] For the reasons set out below, we affirm the judgment.

1. Section 19B of G. L. c. 149 (last amended by St. 1973, c. 620) reads thus:

> "Any employer who subjects any person employed by him, or any person applying for employment, including any person applying for employment as a police officer, to a lie detector test, or requests, directly or indirectly, any such employee or applicant to take a lie detector test, shall be punished by a fine of not more than two hundred dollars. This section shall not apply to lie detector tests administered by law enforcement agencies as may be otherwise permitted in criminal investigations."

We may assume that the first sentence of § 19B forbids all employers, public or private, to impose polygraph tests on those employed by them or applying to them for employment, and also forbids requests to those persons to undergo such tests. With this reading of the first sentence the plaintiffs agree cheerfully, even though it encounters the difficulty that the phrase "including any person applying for employment as a police officer" modifies only the words "any person applying for employment" which suggests that

---

[6] The results were to be disclosed to the State police and counsel to the parties but all was otherwise to await determination of the appeal.

"any person employed" does not comprehend police officers already employed.[7]

The second sentence propounds an exception to the first. The situation plainly within the exception is one where a law enforcement agency is conducting an investigation into a crime alleged to have been committed by a person in connection with the duties of his employment, and the agency is permitted, i.e., not forbidden, to administer a polygraph test to that employee. If, then, the employee refuses or indicates hesitance to submit to the test at the agency's request, the employer (relieved of the prohibition of the first sentence of § 19B) may request that the employee do so, with implied job sanctions if the employee finally declines. This was the situation at bar. In the course of an investigation into alleged criminal conduct of the plaintiff officers, it was proposed that they take a polygraph test at the hands of the State police. Such requests, followed by administration of tests where the subjects agree, are common incidents of criminal investigations, and are "permitted." See *Dolan* v. *Kelly*, 76 Misc. 2d 151, 155 (N.Y. Sup. Ct. 1973). The Legislature, although generally averse to tests forced by employers upon their employees, here recognized an evident interest of the employer in applying some pressure to assist an investigation leading to exoneration of the employee or the opposite.[8]

In contrast to this common sense interpretation, also adopted by the judge below, the plaintiffs offer a curious gloss on the second sentence of § 19B. They would read "as otherwise permitted in criminal investigations" to include the standards set forth in the cases beginning with *Com-*

---

[7] As introduced in the House, 1973 House Doc. No. 7114, from which the present text of § 19B eventuated, read thus: "Any employer who subjects any person *including but not limited to police officers,* employed by him, or any person applying for employment as a police officer, to a lie detector test . . . ." As enacted by St. 1973, c. 620, § 19B omitted the italicized words.

[8] We have dealt here with the core meaning of the excepting language of § 19B. We are not called on to explicate any possible ampler meaning.

*monwealth* v. *A Juvenile,* 365 Mass. 421 (1974),[9] regarding the admissibility of polygraph test results in the trial of criminal cases. The requirements for admission established in the *Juvenile* case include the voluntary agreement by the defendant, before the test is administered, to allow the results, whether favorable or unfavorable to him, to be put in evidence at the trial.[10] So the plaintiffs are suggesting here that the employee — the police officer — must have agreed voluntarily to take the polygraph test administered by the law enforcement agency before the employer is relieved of the prohibition against making a request (with implied job sanctions). But this would reduce the exception of the second sentence of § 19B to a virtual nullity. It would leave the prohibitions of the first sentence intact, without qualification by the second. Such a result is repelled by the opening phrase of the second sentence. It is also repelled by the legislative history of § 19B.[11] In 1973, when the present

---

[9] The later cases are *Commonwealth* v. *Moynihan,* 376 Mass. 468 (1978); *Commonwealth* v. *Vitello,* 376 Mass. 426 (1978); *Commonwealth* v. *Stewart,* 375 Mass. 380 (1978).

We note that the present case does not involve questions of assessing the merits and demerits of polygraph test results as evidence in criminal cases, which on occasion have divided the court. Section 19B appears to be a legislative judgment that the polygraph may be useful as an investigatory aid. Cf. *Dolan* v. *Kelly,* 76 Misc. 2d 151, 155 (N.Y. Sup. Ct. 1973); *Fichera* v. *State Personnel Bd.,* 217 Cal. App. 2d 613, 622 (1963).

[10] The other standards or conditions of admissibility set out in the *Juvenile* case were a finding by the trial judge that the examiner was qualified and the defendant fit to take the test; advice to the defendant about his constitutional rights; written finding by the judge as to the defendant's understanding of his rights and the voluntariness of his assent to the test. In *Stewart* and *Vitello, supra* note 9, we limited the trial use of the polygraph results obtained under the stated conditions to corroboration and impeachment.

[11] The 1963 amendments of § 19B (St. 1963, c. 797) gave the section its present structure of a prohibitory first sentence followed by an excepting sentence: "Any employer who subjects any person employed by him, or any person applying for employment, to a lie detector test, or causes, directly or indirectly, any such employee or applicant to take a lie detector test, shall be punished by a fine of not more than two hundred dollars. This section shall not apply to lie detector tests administered by law enforcement agencies in the performance of their official duties." In 1973,

version of the second sentence was adopted, the results of polygraph tests were understood to be wholly inadmissible in criminal trials on the strength of *Commonwealth* v. *Fatalo*, 346 Mass. 266 (1963). It was some ten months after the 1973 enactment that the doors were opened to any admission of polygraph products at such trials. Thus we infer that the excepting sentence of § 19B does not look to any part of the criminal trial process, but is rather addressed to the investigation of possible criminal activity — and of course the second sentence of § 19B does in fact use the words "criminal investigations."

The plaintiffs are reduced to arguing that the investigation herein must be characterized as departmental, not criminal. They subjoin the contention that if the present investigation may be called criminal, the statute might as well have used the word "investigations" without the adjective, for all investigations would henceforth qualify as criminal, and the intended limitation of the second sentence would be obliterated for practical purposes.

First, we think the present context was criminal from the outset, with the store owner claiming a theft and Miranda warnings cautiously administered before questioning began. But the point need not be labored, as the parties agree on the record that the alleged larceny is "the subject of an ongoing criminal investigation."[12] It does not detract from our conclusion that the investigation also had an obvious departmental aspect. Second, there is hyperbole in the idea that official investigations, particularly of police officers, may all be indifferently denominated criminal. It is enough

---

Senate Doc. No. 673 would have deleted the second sentence. As passed (St. 1973, c. 620) the second sentence was retained in amended form. Thus we have evidence of a legislative desire to balance the privacy interests of employees against the legitimate needs of certain criminal investigations. Compare statutes elsewhere that carry blanket prohibitions. N.J. Stat. Ann. 2A: 170-90.1 (West 1971); Or. Rev. Stat. § 659.225 (1977).

[12] The amicus brief filed by the Commissioner of Labor and Industries for the agency charged with administering § 19B appears to say that the exception of that statute applies in the instant case once it is determined that the investigation was "criminal."

to say that there must be an alleged crime in the picture (not, for example, mere violation of a departmental regulation), and that a requirement of good faith on the side of the department is surely to be implied. Cf. *Dolan* v. *Kelly, supra; Fichera* v. *State Personnel Bd.*, 217 Cal. App. 2d 613 (1963).

2. Pressure by employers on employees accused of criminal conduct while on duty to cooperate with police inquiries or face dismissal, is a fact "that would confront an employee of a private company as a matter of course." *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of the City of N.Y.*, 426 F.2d 619, 626 (2d Cir. 1970). But when the employer is a governmental entity, such coercive action raises questions about the employee's Fifth Amendment rights. Answers are to be found in the line of cases including, in this jurisdiction, the well known *Silverio* and *Broderick* cases.[13] These authorities recognize a power in the head of a police department, supported by certain sanctions, to cause his officers to be interrogated about allegations of criminal behavior while they were on the job, and, by extension, to request that they undergo lie detector tests similarly directed.

In *Garrity* v. *New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that self-incriminatory statements coerced from State policemen by threats of dismissal from their jobs could not be used in subsequent criminal proceedings against them. *Gardner* v. *Broderick*, 392 U.S. 273 (1968), went on to hold that *Garrity's* prohibition could not be circumvented by using a threat of dismissal to extort an initial waiver of the privilege against self-incrimination. See also *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of the City of N.Y.*, 392 U.S. 280 (1968). But it was made clear that "[i]f appellant, a policeman, had refused to answer questions specifically, directly, and narrow-

---

[13] *Silverio* v. *Municipal Court of the City of Boston*, 355 Mass. 623, cert. denied, 396 U.S. 878 (1969). *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33 (1975), cert. denied, 423 U.S. 1048 (1976).

ly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, . . . the privilege against self-incrimination would not have been a bar to his dismissal." *Gardner, supra* at 278. As was later said, "given adequate immunity, the State may plainly insist that [its] employees either answer questions under oath about the performance of their job or suffer the loss of employment." *Lefkowitz* v. *Turley,* 414 U.S. 70, 84 (1973). This court held in *Silverio* v. *Municipal Court of the City of Boston,* 355 Mass. 623, cert. denied, 396 U.S. 878 (1969), that a police officer could lawfully be disciplined for failure "to divulge information pertinent to the issue of his use or abuse of his public trust" (*id.* at 629) where he was assured a "use" immunity with respect to his responses.[14] *Broderick* v. *Police Comm'r of Boston,* 368 Mass. 33 (1975), cert. denied, 423 U.S. 1048 (1976), reaffirmed *Silverio;* there we said, regarding an official inquiry into alleged police misconduct during a "Law Day" celebration, that the Fifth Amendment guaranty "is only tangentially involved,. the more pertinent inquiry here

---

[14] That assurance of a "use" (as distinguished from a "transactional") immunity is sufficient for the purpose is developed in *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of the City of N.Y.,* 426 F.2d 619 (2d Cir. 1970) (following on the Supreme Court decision at 392 U.S. 280 [1968]).

There is only semantic interest in discussing whether a director of public safety has power to confer a "use" immunity without a statute to that effect (cf. *Grand Jurors for Middlesex County for the Year 1974* v. *Wallace,* 369 Mass. 876 [1976]); the immunity arises because of the pressure of the job sanction if the officer should refuse to make disclosure. Compare: "Indeed, a witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute." *Adams* v. *Maryland,* 347 U.S. 179, 181 (1954). "If 'use immunity' thus suffices to permit the discharge of a public employee who refuses to answer questions about his conduct on the ground of self-incrimination, we see no reason why there must be a statute conferring it." *Uniformed Sanitation, supra,* 426 F.2d at 626. In future cases, however, an official in Schiavone's position seeking to investigate alleged criminal conduct by employees of his department might inform and consult with the relevant district attorney.

being whether the substance of the inquiry bears a rational connection either specifically to the officer's direct performance of official acts, or generally to the officer's fitness and ability to serve in governmental service." *Id.* at 37.

What has been said about the disclosure that may constitutionally be requested of public employees extends, we think, to disclosure through the medium of a polygraph test — a test "seemingly directed to obtain 'physical evidence,'" but which "may actually be directed to eliciting responses which are essentially testimonial," thus "evok[ing] the spirit and history of the Fifth Amendment." *Schmerber* v. *California*, 384 U.S. 757, 764 (1966).[15] The decisions elsewhere assimilate polygraph examination to more conventional interrogation in the present constitutional context, even without the benefit of a statutory statement regarding the polygraph such as that contained in the excepting language of our § 19B. See, e.g., *Fichera* v. *State Personnel Bd.*, *supra*; *Coursey* v. *Fire & Police Comm'rs*, 90 Ill. App. 2d 31 (1967); *Dieck* v. *Department of Police*, 266 So. 2d 500 (La. App. 1972); *Dolan* v. *Kelly*, *supra*; *Seattle Police Officers' Guild* v. *Seattle*, 80 Wash. 2d 307 (1972).[16]

The interaction of § 19B and the constitutional guaranty by no means leaves the police officers "relegated to a watered-down version of constitutional rights" such as was deplored and discountenanced in *Garrity*, *supra* at 500. While on Schiavone's assurances they must yield to the polygraph test on pain otherwise of suffering job sanctions,[17]

---

[15] The plaintiffs make no argument based on the Fourth Amendment.

[16] *Engel* v. *Woodbridge*, 124 N.J. Super. 307 (1973) (per curiam), holds that police officers could not be subjected to job sanctions for failure to accede to a polygraph examination, but that followed from a statute with a blanket prohibition; see note 11, *supra*. *DeVito* v. *Civil Serv. Comm'n*, 404 Pa. 354 (1961), may be read as contrary to the line of cases cited in our text, but was overruled by Pa. Stat. Ann. tit. 18, § 7321 (Purdon 1973), inserted by 1969 Pa. Law No. 78.

[17] Schiavone indicated that an officer's polygraph responses, although protected against use in criminal proceedings against him, might be used in administrative proceedings concerning him. That would be true of responses to ordinary questioning under the use immunity (see *Childs* v.

considerable protections attach. The test must be limited in scope as Schiavone indicated, and the investigation according to § 19B must be "criminal," even though by general law the officers could be obliged to submit whether or not the investigation had a criminal character. See *Gardner, Uniformed Sanitation,* and *Dieck, supra* (criminal investigations); *Lefkowitz, Silverio,* and *Roux* v. *New Orleans Police Dep't,* 223 So. 2d 905 (La. App. 1969), cert. denied, 397 U.S. 1008 (1970) (departmental). Superadded to these restrictions, and to the constitutional protection we have elaborated against use of polygraph material or its fruits, which extends to any subsequent Massachusetts, Federal, or sister State criminal proceeding,[18] we have, finally, our domestic rule stemming from *Juvenile* regarding the admissibility and use of polygraph test results. These protections, overlapping but not coextensive, are a strong shield. The plaintiffs cannot demand more.

3. The plaintiffs contend that to discipline a police officer for his refusal to submit to a polygraph test would place an impermissible burden on his Fifth Amendment rights. This appears to be merely a statement of disagreement with the doctrine beginning with *Garrity* v. *New Jersey,* and need not be separately answered.[19]

*Judgment affirmed.*

---

*McCord,* 420 F. Supp. 428, 434 [D. Md. 1976], aff'd sub nom. *Childs* v. *Schlitz,* 556 F.2d 1178 [4th Cir. 1977]; *Maryland State Bar Ass'n* v. *Sugarman,* 273 Md. 306 [1974], cert. denied, 420 U.S. 974 [1975]), and in principle the same could hold for polygraph material. However, we are not called upon to say just how far or in what manner or with what limitations this material could be introduced or play a part in administrative proceedings, e.g., to dismiss an officer for "just cause" under G. L. c. 31, § 41.

[18] See *Murphy* v. *Waterfront Comm'n of N.Y. Harbor,* 378 U.S. 52 (1964).

[19] Besides the brief of the Commissioner of Labor and Industries, a brief amicus was filed by the Boston Police Patrolmen's Association, Inc.