RONALD BELLIN *vs.* FREDERICK J. KELLEY, JR., & others.[1]

Middlesex. February 8, 2001. - October 11, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Criminal Offender Record Information. Labor,* Polygraph test, Discharge. *Statute,* Construction.

On a motion for summary judgment at the trial of a civil complaint alleging that the defendant police officer wrongly revealed information from the plaintiff's criminal offender record to the plaintiff's employer, the plaintiff failed as a matter of law to show a violation of G. L. c. 6, § 172, where the officer was acting pursuant to a regulation permitting a criminal justice agency with official responsibility for a pending criminal investigation to disseminate criminal offender record information that is specifically related to and contemporaneous with that investigation, which regulation was not illegal, arbitrary, or capricious; moreover, the regulation was in harmony with the legislative mandate of G. L. c. 6, § 178A, which authorizes the release to victims and witnesses of such criminal offender record information pertaining to the offense with which they were involved as is necessary for their security and well being. [264-269]

On a motion for summary judgment at the trial of a civil complaint alleging that the defendant employer wrongly threatened to fire the plaintiff employee if he persisted in his refusal to take a polygraph examination requested by police after a break-in at the employer's place of business, the plaintiff failed as a matter of law to show a violation of G. L. c. 149, § 19B (2), where the statute permits an employer to request or require an employee to take a polygraph examination when a law enforcement agency lawfully seeks to conduct such an examination of the employee as part of a criminal investigation. [269-273]

CIVIL ACTION commenced in the Superior Court Department on June 28, 1995.

The case was heard by *Isaac Borenstein,* J., on motions for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Ira H. Zaleznik* for the plaintiff.

---

[1]Kelley Consultants, Inc., Wayne J. Minichielli, and the town of Hopedale. We allowed a motion to intervene filed by the Attorney General.

*Pamela L. Hunt*, Assistant Attorney General (*Peter T. Wechsler*, Assistant Attorney General, with her) for the intervener.

*Mark D. Robins* for Wayne J. Minichielli & another.

*George L. Dresser* (*Nadia R. Totino Beard* with him) for Frederick J. Kelley, Jr., & another.

SOSMAN, J. The plaintiff has appealed from orders of the Superior Court allowing the defendants' motions for summary judgment. The plaintiff's claims stem from alleged misconduct by his employer and by the police in their investigation of a break-in at the employer's business, an investigation that led to no criminal charges but that resulted in the termination of the plaintiff's employment.[2] The Appeals Court affirmed the order granting summary judgment in favor of the employer and its president, but reversed in part with respect to the defendant police officer and the town that employed him. *Bellin* v. *Kelley*, 48 Mass. App. Ct. 573, 583 (2000). We granted all applications for further appellate review. For the following reasons, we affirm the orders allowing summary judgment in favor of all defendants.

1. *Facts.* Kelley Consultants, Inc. (KCI), provides tax collection services to various Massachusetts municipalities. The plaintiff, Ronald Bellin, was employed at KCI as a collector beginning in the summer of 1991. One year later, during the weekend of August 1, 1992, a significant amount of cash was stolen from KCI during a break-in at its Hopedale office. Officer Wayne Minichielli of the Hopedale police department was dispatched to investigate.

Based on his initial investigation, Minichielli suspected that the break-in had been perpetrated by or with the assistance of someone familiar with KCI's office, characterizing the theft as an "inside job." At the time, KCI had approximately six employees, including Bellin. Minichielli ran a background check

---

[2]Specifically, Bellin alleges that the defendants disclosed and used information about his prior criminal record and coerced him into taking a polygraph examination. Based on that alleged wrongful conduct, Bellin has brought claims for violation of G. L. c. 6, § 172, violation of G. L. c. 149, § 19B, wrongful termination, violation of G. L. c. 12, § 11I, tortious interference with contractual relations, and invasion of privacy.

on all those employees.[3] That check revealed that Bellin had a prior criminal record, including multiple charges of larceny and fraud arising out of the passing of bad checks.[4] No other KCI employee was found to have any prior criminal record.

After uncovering this information, Minichielli met with Bellin at the Hopedale police station. Minichielli gave Bellin his Miranda rights, and requested that Bellin take a polygraph examination. Initially, Bellin agreed to the examination but, shortly before the scheduled date, Bellin contacted Minichielli and told him that he had changed his mind. Bellin contends that, during the course of that conversation, Minichielli threatened to reveal Bellin's criminal record to KCI if he did not take the examination. Despite this alleged threat, Bellin refused to take the examination.

After this conversation, Minichielli spoke with Frederick Kelley, the president and treasurer of KCI, and advised him that Bellin was a suspect in the break-in. Minichielli told Kelley that Bellin had a prior criminal record and that Bellin had refused to take a polygraph examination. Kelley then confronted Bellin, and told Bellin that, unless he took the polygraph examination as requested by the police, he would be fired. In order to avoid losing his job, Bellin agreed to proceed with the examination.

Bellin's polygraph examination was administered by a State trooper on October 29, 1992. Immediately prior to the examination, Bellin signed an acknowledgment that he was taking the examination "voluntarily — without threats, duress, coercion, force, promise of immunity or reward." On completion of the examination, the examiner concluded that Bellin had exhibited signs of deception. That result was communicated to KCI, whereupon Bellin was fired. No one (including Bellin) was ever charged with any crime stemming from the break-in at the KCI office.

2. *Discussion.* Bellin has brought a series of claims against Minichielli, the town of Hopedale, KCI, and Kelley, all premised

---

[3]Minichielli also ran background checks on customers who had recently been in the KCI office. Nothing pertinent was uncovered with respect to any of those customers.

[4]Minichielli testified at a deposition that Bellin's record had other charges, but Bellin contends that those other entries on his record were in error.

on the theory that Minichielli's disclosure of information from Bellin's criminal record was in violation of G. L. c. 6, § 172, and that Kelley's threat to fire him if he did not take the polygraph examination was in violation of G. L. c. 149, § 19B. As a matter of law, Bellin has failed to show that either statute was violated. The defendants were thus entitled to summary judgment on all claims, as those alleged statutory violations formed the basis of all claims against them.

a. *Disclosure of criminal offender record information, G. L. c. 6, § 172.* Bellin contends that G. L. c. 6, § 172, prohibited any police disclosure of his prior criminal record, which the statute protected as criminal offender record information (CORI).[5] The statute provides that "criminal offender record information . . . shall be disseminated, whether directly or through any intermediary, only to (*a*) criminal justice agencies; (*b*) such other agencies and individuals required to have access to such information by statute . . . and (*c*) any other agencies and individuals where it has been determined that the public interest in disseminating such information to those parties clearly outweighs the interest in security and privacy." *Id.* For criminal justice agencies, "[t]he extent of such access shall be limited to that necessary for the actual performance of the criminal justice duties . . . ." *Id.* For access under clause (*c*), the criminal history systems board (established by G. L. c. 6, § 168) (board) must first determine and certify by a two-thirds majority "that the public interest in disseminating such information to such party clearly outweighs the interest in security and privacy." G. L. c. 6, § 172. Because KCI and Kelley do not qualify as "criminal justice agencies," are not required to have access under some other statute, and did not obtain the requisite certification from the board under clause (*c*), Bellin contends that his prior record could not lawfully be disclosed to them.[6]

---

[5] The term "[c]riminal offender record information" is defined as "records and data in any communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release." G. L. c. 6, § 167.

[6] Bellin also contends that Minichielli wrongfully threatened to disclose his prior record in order to coerce him into taking a polygraph examination. However, Bellin still refused to take the examination, and Minichielli's alleg-

The defendants rely on a board regulation, 803 Code Mass. Regs. § 2.04 (5) (a), as authorization for the disclosure made in this case. The regulation provides that "[a] criminal justice agency with official responsibility for a pending criminal investigation or prosecution may disseminate CORI that is specifically related to and contemporaneous with an investigation or prosecution." *Id.* The Hopedale police department was the criminal justice agency responsible for investigating the break-in and theft at KCI's office; Bellin's prior record of larceny was "specifically related to" that investigation (as it formed one of the bases for suspecting him of the break-in); and the disclosure occurred while the investigation was still ongoing. As such, the regulation would appear to authorize Minichielli's disclosure to Kelley.[7] However, Bellin contends (and the Appeals Court agreed) that the regulation was in excess of the board's statutory authority and therefore invalid. *Bellin* v. *Kelley*, 48 Mass. App. Ct. 573, 577-578 (2000). We disagree with that analysis and uphold the validity of the regulation.

A party challenging the validity of a regulation must prove "that the regulation is illegal, arbitrary, or capricious." *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 722, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983). "A plaintiff must prove 'the absence of any conceivable ground upon which [the rule] may be upheld.' " *Id.*, quoting *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776

---

edly coercive threat did not cause Bellin to change his mind. (Bellin ultimately submitted to the polygraph examination at the insistence of his employer, who threatened to fire him. See *infra*.)

[7]Bellin protests that the disclosure was not "necessary" to the investigation and did not "advance[]" it in any way. The regulation does not impose any requirement that disclosure be "necessary," nor does it test, with hindsight, whether a particular disclosure in fact "advanced" the investigation. Bellin also contends that the use of the term "contemporaneous" means that the CORI itself must originate in the same investigation. However, during the investigation phase, the data being gathered and recorded are not yet CORI, as the term "criminal offender record information" is "restricted to that recorded as the result of the initiation of criminal proceedings." G. L. c. 6, § 167. Prior to the initiation of criminal proceedings, the investigation itself does not yield any CORI that is protected by the statute. Thus, in context, a regulation permitting dissemination of CORI "contemporaneous with an investigation" merely means that the dissemination must occur during the course of the investigation. It does not require that the CORI being released originate with that same investigation.

(1980). Therefore, we "must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 723, quoting *American Family Life Assurance Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983). "[E]nforcement of such regulations should be refused only if they are plainly in excess of legislative power." *Berrios* v. *Department of Pub. Welfare,* 411 Mass. 587, 596 (1992). However, "a regulation that is irreconcilable with an agency's enabling legislation cannot stand." *Quincy* v. *Massachusetts Water Resources Auth.,* 421 Mass. 463, 468 (1995).

Here, the Legislature authorized the board to "promulgate regulations regarding the collection, storage, access, dissemination, content, organization, and use of criminal offender record information." G. L. c. 6, § 168. This mandate, in and of itself, provides the board with broad powers to address situations not specifically enumerated in the statute. See *Dowell* v. *Commissioner of Transitional Assistance,* 424 Mass. 610, 614 (1997); *Massachusetts Respiratory Hosp.* v. *Department of Pub. Welfare,* 414 Mass. 330, 334 (1993).

Notwithstanding that broad delegation of rule making authority, Bellin argues that the three permissible forms of dissemination listed in G. L. c. 6, § 172, are exclusive, and that the board may not expand that list by regulation without thwarting the legislative mandate. The argument ignores the express provision allowing criminal justice agencies access to CORI, which implicitly allows such agencies to use that information in "the actual performance of [their] criminal justice duties." *Id.* Depending on the specifics of a particular investigation, it may be necessary to engage in widespread dissemination of information that would otherwise be protected by the statute. As but one example, the police may need to distribute flyers containing information from a suspect's prior criminal history in order to locate and apprehend that suspect.[8] See 803 Code Mass. Regs. § 2.04 (5) (b) (law enforcement "may disseminate CORI that is

---

[8]As a more specific example, a poster alerting the public to and seeking information on the whereabouts of an escaped prisoner would likely contain

specifically related to and contemporaneous with the search for or apprehension of any person"). Under Bellin's cramped reading of the statute, all disclosures by police, no matter how justified by the exigencies of an investigation, would be prohibited. Such a reading does not comport with the Legislature's intent that law enforcement have access to CORI for the purpose of "perform[ing]" their "criminal justice duties." G. L. c. 6, § 172. See *Whirty* v. *Lynch*, 27 Mass. App. Ct. 498, 500-501 (1989) (rejecting argument that prosecutor could not disclose CORI to judge setting bail).

Bellin's argument also ignores other sections of the statute that allow (and in some cases require) disclosure of CORI in a wide variety of circumstances.[9] Most pertinent for our analysis of this particular regulation, G. L. c. 6, § 178A, provides that victims and witnesses of crime "shall be certified" to receive CORI pertaining to the offense with which they were involved and authorizes criminal justice agencies to disclose "to such persons such additional information, including but not limited to evaluative information, as such agencies determine, in their discretion, is reasonably necessary for the security and well being of such persons."[10] This provision recognizes that victims and witnesses have a justifiable need for information, including

---

many forms of information that would all qualify as CORI: a photograph from the prisoner's most recent arrest; aliases or other identifying information uncovered by the police in earlier cases involving the prisoner; the name of the institution from which the prisoner escaped; and, to alert the public to the particular danger posed by the individual, the nature of the conviction that led to incarceration. All of this information would be protected as CORI. See G. L. c. 6, § 167. If we adopted Bellin's interpretation of the statute, distribution of such a poster (or any comparable form of "wanted" poster) would violate G. L. c. 6, § 172.

[9]See G. L. c. 6, § 172B (Department of Youth Services and Department of Social Services have access to CORI in order to evaluate foster homes and adoptive homes); § 172C (mandating that home health agencies check CORI with regard to any employee or volunteer providing in home or community services to elderly or disabled clients); § 172D (Department of Revenue access to CORI for purposes of establishing paternity or child support obligations); § 172E (mandating that long-term care facilities check CORI on all applicants for positions involving rendering of care to residents); § 172F (office of child care services granted access to CORI to evaluate licensed child care providers).

[10]For the definition of "victim" and "witness," G. L. c. 6, § 178A, cites the definitions in G. L. c. 258B, which provides various rights to victims and

CORI, that pertains to the crime that they have either suffered or witnessed, and indeed requires that the board approve their requests for such access to CORI. Cf. G. L. c. 258B, § 3 (*a*) (requirement that prosecutor "periodically apprise the victim of significant developments in the case"). Section 178A also recognizes that, in some cases, victims and witnesses may need such information for their own safety and security, and allows criminal justice agencies discretion to reveal to victims and witnesses information that is "reasonably necessary" for that purpose.

The challenged regulation, 803 Code Mass. Regs. § 2.04 (5) (a), represents the board's reasonable determination that, during the course of an investigation, law enforcement agencies often need to reveal CORI that is related to that investigation. The statute implicitly allows criminal justice agencies to use CORI to perform their criminal justice duties, and the board's regulation simply authorizes the use of such information for that fundamental law enforcement purpose. Reliance on that regulation to justify disclosure to the victim in this case closely mirrors the disclosure to victims provided in G. L. c. 6, § 178A. Here, the officer investigating the crime suspected that the

witnesses of crimes. At the time of the events in this case, G. L. c. 258B, § 1, inserted by St. 1983, c. 694, § 2, defined "[v]ictim" as "a natural person who suffers direct or threatened physical, emotional or financial harm as the result of the commission or attempted commission of a crime." That definition included Kelley, who had suffered direct financial harm from the break-in and theft of money from his company's offices. In 1995, several years after these events, the Legislature expanded the list of victims' rights in G. L. c. 258B, § 3, as appearing in St. 1995, c. 24, § 5, and redefined the term "[v]ictim" as "any natural person who suffers direct or threatened physical, emotional, or financial harm as the result of the commission or attempted commission of a crime or delinquency offense, *as demonstrated by the issuance of a complaint or indictment*" (emphasis added). St. 1995, c. 24, § 4. Because there was no complaint or indictment issued in connection with the break-in at KCI, Kelley would not qualify as a "victim" under the current definition. However, he would potentially still qualify as a "[w]itness," defined as "any person who has been or is expected to be summoned to testify for the prosecution *whether or not any action or proceeding has yet been commenced*" (emphasis added). G. L. c. 258B, § 1, as appearing in St. 1983, c. 694, § 2. Kelley, the owner of the company victimized by the break-in and theft, and present on the morning the crime was discovered, would be "expected" to testify for the prosecution. Under G. L. c. 6, § 178A, disclosure of CORI is to be made to a "witness" just as it is to a "victim."

perpetrator was an employee of the victim. Notifying the employer of those suspicions (and the bases for those suspicions) allowed the employer to take precautions to protect himself and his company from any further criminal acts of a possibly disloyal insider. Leaving a victim in ignorance in such circumstances, and thus completely vulnerable to further criminal acts, would have been viewed as irresponsible on the part of the police. The statute, G. L. c. 6, § 178A, is designed to address such situations, and the regulation under review, 803 Code Mass. Regs. § 2.04 (5) (a), is "in harmony" with that legislative mandate.[11] *Borden, Inc.* v. *Commissioner of Pub. Health,* 388 Mass. 707, 723 (1983), quoting *American Family Life Assurance Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 477 (1983). The plaintiff has not met his burden of demonstrating that the regulation is "plainly in excess of legislative power," *Berrios* v. *Department of Pub. Welfare,* 411 Mass. 587, 596 (1992), and we therefore hold that the regulation is valid. The CORI disclosure that occurred here was authorized under the regulation, and that disclosure was therefore lawful.

b. *The polygraph examination.* Bellin's further claims assert, as their fundamental premise, that Kelley wrongfully threatened to fire him if he persisted in his refusal to take a polygraph examination. Bellin relies on G. L. c. 149, § 19B (2), which provides as follows:

> "It shall be unlawful for any employer or his agent, with respect to any of his employees, or any person applying to him for employment, including any person applying for employment as a police officer, to subject ·such person to, or request such person to take a lie detector test within or without the commonwealth, or to discharge, not hire,

---

[11]The Appeals Court expressed concern over the breadth of the regulation, noting that it would allow widespread public distribution of CORI. *Bellin* v. *Kelley,* 48 Mass. App. Ct. 573, 578 (2000). As discussed above, there are times when such widespread dissemination is well justified for "the actual performance of . . . criminal justice duties." G. L. c. 6, § 172. We need not, in the present case, concern ourselves with extreme hypotheticals involving needlessly overbroad or malicious dissemination of CORI during an investigation. Cf. *Roe* v. *Attorney Gen.,* 434 Mass. 418, 441 (2001). The disclosure at issue here — a single disclosure to the victim of the crime being investigated — is well within what the Legislature authorized.

demote or otherwise discriminate against such person for the assertion of rights arising hereunder. This section shall not apply to lie detector tests administered by law enforcement agencies as may be otherwise permitted in criminal investigations."

While the first sentence of this subsection prohibits employers from requesting or requiring an employee to take a polygraph examination, the exception set forth in the second sentence allows employers to make such requests and impose such requirements when a law enforcement agency lawfully seeks to conduct such . an examination of the employee as part of a criminal investigation. *Baker* v. *Lawrence*, 379 Mass. 322, 326-329 (1979).[12]

Bellin seeks to distinguish *Baker* v. *Lawrence, supra,* on various grounds, none of which is persuasive. First, he argues that the alleged criminal conduct of the employees in *Baker* occurred while they were performing their jobs. The break-in at issue in the present case occurred while Bellin was off duty. Our explication of the exception in § 19B (2) does not support any such distinction: "The situation plainly within the exception is one where a law enforcement agency is conducting an investigation into a crime alleged to have been committed by a person in connection with the duties of his employment, and the agency is . permitted, i.e., not forbidden, to administer a polygraph test to that employee." *Baker* v. *Lawrence, supra* at 327. We noted, however, that we were dealing "with the core meaning" of the exception and that we did not, in that case, need "to explicate any possible ampler meaning" of the exception. *Id.* at 327 n.8. The literal wording of § 19B (2) contains no express limitation restricting the exception to situations involving some particular form or degree of connection between the criminal conduct under investigation and the employee's job. However, as in *Baker,* we need not "explicate any possible ampler meaning" of the exception in this case. While Bellin was not literally on duty at the time of the weekend

---

[12]Subsequent to our decision in *Baker* v. *Lawrence,* 379 Mass. 322 (1979), the Legislature rewrote G. L. c. 149, § 19B. St. 1985, c. 587, § 1. The exception at issue in both *Baker* and the present case (now found in § 19B [2]) was unchanged.

break-in at KCI, an employee's theft of an employer's property during off hours, using the employee's inside knowledge in order to perpetrate that theft, would constitute conduct closely connected to the employee's work.[13] To whatever extent (if any) the statute imposes a requirement that the crime being investigated have some connection to the employee's job, that requirement has been met in this case.

Bellin argues, as a further distinction between this case and *Baker* v. *Lawrence, supra,* that the employees in that case had actually been accused of a crime, whereas the police were merely suspicious of Bellin based on "overwrought imagination." While there may be such distinctions between the facts of the two cases, nothing in § 19B (2) requires any particular degree of support or verification of the police suspicions before an employer may insist that the employee cooperate with a police polygraph examination.

Bellin next argues that the exception does not apply because the State police polygraph examination was not "otherwise permitted." He contends that, in order to be "permitted," the examination must be voluntary or, in the alternative, the person being examined must be granted immunity. As to the argument that voluntariness is a predicate for the exception in § 19B (2), we rejected such an argument in *Baker* v. *Lawrence, supra* at 327-329. The imposition of a requirement that the employee take the polygraph test voluntarily in order for the employer to have the benefit of the exception "would reduce the exception of the second sentence of § 19B [(2)] to a virtual nullity." *Id.* at 328.[14]

---

[13]The Appeals Court characterized the exception as extending to "a reasonable effort by the employer to maintain an honest work force and a working environment secure against criminal incursions," *Bellin* v. *Kelley,* 48 Mass. App. Ct. 573, 581 (2000), a standard that is readily satisfied on the present facts. Again, this case does not require us to determine the outer boundaries of the exception in § 19B (2), and we express no opinion as to whether a particular connection with the employee's work must be shown before the exception is applicable.

[14]Bellin also contends that Kelley should be viewed as an "agent" of the police, who was enlisted by the police to pressure him into taking the examination. Without parsing the merits of this "agency" theory, we note that the statute permits employers to exert pressure on employees in precisely this fashion — i.e., to impose employment consequences on an employee who

As to immunity, there is no requirement that a person employed by a private entity be given immunity before the private employer can encourage or insist that the employee give a statement to the police or submit to a police conducted polygraph examination. In *Baker* v. *Lawrence, supra* at 330-333, we dealt with the issue of immunity because the employees in that case were public employees. "[W]hen the employer is a governmental entity, such coercive action [threat of dismissal for failure to take polygraph examination] raises questions about the employee's Fifth Amendment rights." *Id.* at 330. See *Commonwealth* v. *Dormady*, 423 Mass. 190, 193 (1996) ("A public employer has the power to compel the testimony of a public employee regarding that employee's ability directly to perform required governmental tasks or the employee's general fitness for public service," but such testimony "cannot be compelled under threat of discharge absent a grant of immunity"); *Carney* v. *Springfield*, 403 Mass. 604, 608-609 (1988) ("public employees cannot be discharged simply because they invoke their privilege under the Fifth Amendment to the United States

refuses to take a polygraph examination that the police wish to conduct. That the police (and not the employee) inform the employer of their desire to conduct the examination, and of the employee's refusal to cooperate with that examination, should not deprive the employer of the benefit of the exception set forth in § 19B (2).

We note that § 19B (2) addresses only the conduct of the employer in requesting or requiring that an employee take a polygraph examination conducted by law enforcement during the course of a criminal investigation. It has no bearing on the admissibility of statements made to the police. In order to introduce a defendant's statement at his criminal trial, the Commonwealth must show that both the waiver of rights and the statement itself were voluntary, with the issue of voluntariness assessed in light of the totality of the circumstances. *Commonwealth* v. *Edwards*, 420 Mass. 666, 670, 673 (1995). While § 19B (2) permits an employer to threaten an employee with job-related consequences for failure to cooperate with a police conducted polygraph examination, any such threats will of course be considered as part of the totality of the circumstances when assessing the voluntariness of an employee's waiver of rights and the voluntariness of any resulting statement to the police.

Similarly, nothing in § 19B (2) has any bearing on the admissibility of the results of polygraph examinations in criminal trials. See *Commonwealth* v. *Mendes*, 406 Mass. 201, 212 (1989) (polygraph evidence inadmissible in criminal trials). But see *Commonwealth* v. *Stewart*, 422 Mass. 385, 389 (1996) (admissibility of polygraph evidence could be established if there were evidence of its reliability).

Constitution not to incriminate themselves in refusing to respond to questions propounded by their employers"). By comparison, however, "[p]ressure by employers on employees accused of criminal conduct while on duty to cooperate with police inquiries or face dismissal, is a fact 'that would confront an employee of a private company as a matter of course.' " *Baker* v. *Lawrence, supra* at 330, quoting *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of the City of N.Y.*, 426 F.2d 619, 626 (2d Cir. 1970), cert. denied, 406 U.S. 961 (1972). Bellin cites no authority for the proposition that such pressure from a private employer violates his constitutional rights or renders involuntary any subsequent statements to the police. There was no requirement that Bellin be granted immunity as a precondition to his private employer's insistence that he cooperate with police requests to submit to a polygraph examination.

3. *Conclusion.* Finding nothing unlawful in either the alleged disclosure of Bellin's criminal record or in his employer's insistence that he submit to a State police polygraph examination, the predicate for each of Bellin's various claims against the defendants is lacking. Accordingly, the defendants are entitled to summary judgment in their favor on each and every count of Bellin's complaint.

*Judgment affirmed.*